Opinion issued February 14, 2019



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-18-00834-CV

———————————

## IN THE INTEREST OF T.R. AND P.H., CHILDREN

———————————

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2017-03365J**

———————————

## MEMORANDUM OPINION

Appellant, T.D.M. ("Mother"), challenges the trial court's decree terminating her parental rights to two of her minor children.[1] In her sole issue on appeal, Mother

---

[1] For purposes of this Opinion, we will refer to the children by the aliases "Troy" and "Paul." Their older sister and brother, both minors who are not the subjects of this appeal, will be "Tara" and "Tim." Their adult brother will be "Trey." *See* TEX. R. APP. P. 9.8(c)(2).

contends that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest. We affirm.

## BACKGROUND

Mother has five children: a 19-year-old adult son, Trey; a sixteen-year-old daughter, Tara; a thirteen-year-old son, Tim; a five-year-old son, Troy; and a one-year-old son, Paul. At the time of trial, Tara was living with a relative, Tim was in a residential treatment center, and Troy and Paul, the subjects of this appeal, were together in a foster home. Trey was living with his girlfriend's family.

### *History with the Department*

The family has a long history with the Department of Family and Protective Services ("the Department"). In 2008, the Department received a referral with allegations of neglectful supervision of Trey, Tara, and Tim. Tim, a toddler at the time, was found wandering in the apartment complex. The children had been left with an aunt, and the Department concluded that there was no evidence to prove Mother was at fault.

In 2010, the Department received allegations that Mother had physically abused Tim and that he had multiple bruises to his lower back, arms, and legs because of being spanked. The family acknowledged the allegation and the Department considered it substantiated.

2

In 2016, the Department again received allegations of neglectful supervision of Trey, Tara, and Tim. The allegations included domestic violence by Mother's boyfriend that involved firing a weapon and threatening to kill Mother and the children. The allegations were not validated because the Mother had moved and the children did not disclose any domestic violence.

In April 2017, the Department received a referral alleging that Mother had physically abused Tim. Tim reported that Mother smokes "kush" all the time and becomes very mad. Tim said that she hit him with a hanger and choked him, and had, in the past, punched him in the face with her fist. In May 2017, the Department received an intake alleging that Mother bit Tim on the arm and that he had a cigarette burn on his left arm. And, in June 2017, the Department received a referral alleging that Tim had been sexually abused by his father and an uncle.[2] The April 2017 referral, followed by the May and June 2017 referrals, gave rise to the Department's decision to remove the children.

During the proceedings, Tara's and Tim's cases were severed, leaving only the two youngest children, Troy and Paul, in the present appeal.

---

[2] There is also evidence in the record that Tim, in turn, has sexually abused his younger brother, Troy.

***Trial***

*Exhibits*

At the commencement of trial, the Department offered several exhibits, including, Mother's family service plan, Mother's 4Cs assessment by Harris County Protectives Services, Mother's drugs tests, and a criminal conviction of Paul's father for the aggravated assault of Mother.

*Mother's testimony*

Mother testified that the Department became involved with the family the latest time when she got into a physical alteration with Tim. Mother denied choking him and hitting him with a hanger, but she admitted that she "whopped him with a belt." She claimed that she "whopped" him when "he touched [Troy]." She admitted that she had left bruises and marks on Tim before because of her "whoppings."

Mother also admitted that she had a positive urine test for methamphetamines, cocaine, and amphetamines in May 2017, but she claimed that she had only taken Ecstasy. She also admitted that her hair tested positive for methamphetamines until October or November of 2017.

Mother acknowledged the 2008 case that the Department had brought after Tim was found wandering around in the apartment complex when he was a toddler. Mother claimed that she left the two-year-old child with an aunt who fell asleep, allowing the child to escape.

4

Mother also testified about the 2010 case that included allegations that Tim had bruises all over his back, arms, and legs because of being spanked. Mother acknowledged that Tim's injuries in 2010 were because she "whopped" him.

Mother discussed the 2016 referral, which began with an allegation that her boyfriend had fired a weapon at her. Mother denied that her boyfriend had assaulted her, even though his conviction for doing so was also admitted at trial.

Mother testified about her family services plan. She completed her substance abuse assessment and her psychosocial assessment. Mother admitted that she had not completed her individual counseling.

When asked about whether she had stable housing, Mother testified that she "moved back in with the lady . . . [a]nd she said this time she would say that [the children] could stay with us." She acknowledged that she had been living for some time in a hotel before moving back in with "the lady."

Mother acknowledged that her psychosocial analysis recommended that she have increased visitation with her youngest son, Paul, because he was an infant when removed, and she admitted that she did not take advantage of the visitations that had been scheduled because she worked.

Mother acknowledged that all the fathers of her children, except the father of her adult son, had significant criminal histories. She said that she did not think about

5

bringing men with criminal histories into her home with her children, but she claimed that she was unaware of their criminal records.

*The Caseworker's Testimony*

Leshon Rasheed testified that she is the caseworker for all the minor children. She testified that, at the time of trial, Tim was in a residential treatment center. The Department was aware that he had sexually abused his younger brother, Troy, and wanted to get Tim into a specialized placement so that he could receive treatment as a sexual-assault offender.

Rasheed also testified that Troy and Paul were placed in a foster home where they were doing well. When Troy was first placed in the home, he had issues with tantrums, but he was doing much better now. Troy was also receiving therapy as a sexual abuse survivor. Paul was developmentally on track, and both boys were bonded to one another and had a good relationship. The foster family hopes to adopt the two boys.

Rasheed testified that the Department wanted Mother's parental rights to Troy and Paul to be terminated because they had been exposed to domestic violence, physical abuse, drug use, and neglect. She also said that they "would need stability."

The Department did not seek termination of Mother's parental rights to Tim, but it was seeking primary managing conservatorship so that he could receive the treatment he needed as a sexual-assault perpetrator. Rasheed acknowledged that

6

Tim had "a long road ahead of him as far as the services that he needs," and that the Department wanted to continue to provide those services for him. She also acknowledged that Tim was "quite a bit older than the two little ones" and that "[the Department] would like to see his progress in [the sex offender program] and possibly, in the future, if Mom is able to get the help that she needs to reunify with her." She also noted that, as a teenager with behavioral issues, Tim was not likely to be adopted.

Regarding Mother's service plan, Rasheed said that Mother had not completed Narcotics Anonymous treatment, as she had claimed. Rasheed said that Mother had provided attendance logs from April showing that she had attended three meetings. Mother had not obtained a sponsor, as required.

Rasheed testified that she spoke to "the lady" with whom Mother was living, and "the lady" did not know about the Mother's plans to bring the children into the home. Mother had also not been very forthcoming about when she had lived with "the lady" and when she had lived in a hotel.

Rasheed testified that Mother visited her children about four times between August 2017 and April 2018. Beginning in April 2018, Mother began visiting the children more frequently after it was brought up in mediation that she had not been doing so. Mother gave Rasheed "a lot of excuses," but she began to come to visits when Rasheed would schedule the appointments rather than relying on Mother to do

so. When Rasheed began "holding [Mother's] hand and babysitting her through the process," Mother's visits with the children became more regular. This lack of taking responsibility for visitation concerned Rasheed. Rasheed said Mother did visit and bring cake and gifts on the children's birthdays, and the visits with her were appropriate and the children appeared to have bonded with her.

Rasheed was concerned that Mother had not made substantial progress and was "minimizing" why the children came into the Department's care. Specifically, Rasheed felt that Mother was minimizing the seriousness of "the whoppings that she gave her children" and the impact her drug use had on her ability to care for the children.

Regarding plans for the children, Rasheed had denied a home study on a woman suggested by Mother because the man in the home refused to allow a background check to be done. Three months before trial, Paul's paternal aunt was suggested as a possible placement, but Rasheed was unable to reach her because the aunt was away receiving medical care. Rasheed testified that Troy and Paul were bonded to one another, were in a "healthy and stable home," and that the foster parents were willing to adopt if Mother's parental rights were terminated.

### Trial Court's Ruling

At the end of the trial, the trial court terminated Mother's parental rights to Troy and Paul, based on endangering conditions, endangerment, and failure to

comply with a court order that established the actions necessary to have the children returned.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), and (O).  The court further found that termination of Mother's parental rights was in Troy's and Paul's best interest.  *See id.* § 161.001(b)(2).

This appeal followed.

## SUFFICIENCY OF BEST INTEREST FINDING

In her sole issue on appeal, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights to Troy and Paul was in the children's best interest.

### *Standard of Review*

In a case to terminate parental rights brought by the Department under section 161.001, the Department must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. *Id*. § 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In conducting a legal-sufficiency review in a parental-rights-termination case brought by the Department under Family Code section 161.001, we must look at all

9

the evidence to determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction about the truth of the matter on which the Department bore the burden of proof. *See In re J.O.A.*, 283 S.W.3d at 344–45 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* at 344; *Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

In conducting a factual-sufficiency review, we view all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" regarding the finding under review. *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

The Department must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(b)(1) and that termination is

10

in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, only one predicate finding is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Here, Mother does not challenge the trial court's findings under subsections 161.001(b)(1)(D), (E), or (O); rather, she challenges the sufficiency of the evidence supporting the trial court's finding under section 161.001(b)(2) that termination of her rights was in the children's best interest.

*Applicable Law*

There is a strong presumption that the best interest of the children will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). In determining whether termination of a mother's parental rights is in a child's best interest, we consider several nonexclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person

11

seeking custody to promote the best interests of the child, (6) plans for the child by the person seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent that may indicate that the parent-child relationship is improper, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department is not required to prove all these factors, and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under Section 161.001(b)(1) also may be relevant to determining the child's best interest. *See id.* at 27–28.

This is not an exhaustive list, and a court need not have evidence on every element listed to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *See id.* at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Furthermore, the best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *See In re N.R.T.*, 338 S.W.3d at 677.

*Analysis*

Here, multiple factors support the trial court's finding that termination was in the children's best interest. Troy was five years old and Paul was one year old at the time of trial. As such, they were too young to express their desires. Although there is some evidence that they seemed bonded with Mother during her visits, they had spent very little time with her. *See In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children."). Indeed, Paul was an infant when he came into the Department's care, and Mother had been inconsistent in exercising her parental visitation until a few months just before trial. The boys are bonded to one another and have been in the same foster home together the entire time. The evidence is that both boys are doing very well in their foster home and that the foster parents would like to adopt them. *See Rogers v. Dep't of Family & Protective Servs.*, 175 S.W.3d 370, 378 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (concluding that successful foster placement with possibility of adoption supported best-interest finding); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (affirming best-interest finding when child was thriving in foster care). This evidence is relevant to the first, second, and sixth *Holley* factors and supports the trial court's best-interest finding.

The evidence presented in support of the endangerment finding also supports the trial court's termination decision. *See C.H.*, 89 S.W.3d at 28. The children came into the Department's care because of, and Mother admitted to, "whopping" her children, though most often Tim.  There was evidence that Mother minimized the severity of her "whoppings," which left bruising and marks.  From this, the trial court could have concluded that Mother's inappropriately severe physical punishments reflected both a lack of parenting skills and presented a danger to the children.

There was also evidence that Mother tested positive for cocaine and methamphetamine, although she only admitted to taking one Ecstasy pill. She admitted leaving her children with babysitters when she went out to use drugs. There was also evidence that, on at least one occasion, she left her children with someone who allowed a toddler to escape and wander unsupervised through an apartment complex. *See In re W.J.B.*, No. 01-15-00802-CV, 2016 WL 1267847, at *9 (Tex. App.—Houston [1st Dist.] Mar. 31, 2016, no pet.) (mem. op.) (stating that "evidence of past misconduct or neglect can be used to measure a parent's future conduct"); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (parent's drug use supports finding that termination is in best interest of child). Such inference is relevant not only to the children's present and future emotional and physical needs and dangers but also to the stability of Mother's home, as contrasted

14

with the stability of the children's foster home. *See In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.).

Mother also claimed that she had permission to bring her children into "the lady's home," where presumably she was renting a room. However, when questioned by Rasheed, "the lady" contradicted that claim. From this evidence, as well as Mother's equivocation on the issue of where she had been residing, the trial court could have concluded that Mother did not have a stable home for the children.

Mother also testified that she "did not think about it" before bringing men with criminal records into her children's lives. At least one of the men pleaded guilty to assaulting her, but she continued to deny that he was abusive. In light of the above-detailed evidence, the third, fourth, and seventh *Holley* factors also weigh in favor of termination.

Nevertheless, Mother argues that because the Department is not seeking termination of her parental rights in Tim's case, "the agency clearly believes that [Mother] is capable of parenting a child who has more special needs than either of the two children involved in this case . . . " and that "[t]he only real difference is that the agency wants to move these children on to adoption and cut the mother's time off in this case." Essentially, Mother is arguing, without authority, that the Department can never terminate parental rights as to some of Mother's children

without terminating as to them all. That is clearly not the case; we must determine best interest as it applies to each child and his particular circumstances. The record makes clear that Tim is not living with Mother and that the Department has no plans to return him to Mother in the near future. Instead, the Department obtained primary managing conservatorship of Tim so that it could continue to provide him the services he needs as a sexual offender. Tim was much older than Troy and Paul, and though in a residential treatment facility, he was not placed in a foster home that was meeting his needs. Tim, because of his age and history, was unlikely to be placed with an adoptive family. And, the Department, though not seeking immediate termination of Mother's rights in Tim's case, did not foreclose that possibility for the future. Because Tim's "best interest" is not necessarily the same as Troy's and Paul's "best interest," the evidence is not legally and factually insufficient simply because the Department is not presently seeking termination of Mother's rights in Tim's case. Giving Mother "more time" in Tim's case does not necessarily mean that the Department must do the same in Troy's and Paul's cases. *See Wyatt v. Dep't of Family & Protective Servs.*, 193 S.W.3d 61, 69 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (rejecting argument that children's best interest would be served by keeping them in foster care indefinitely until reunification could be achieved in lieu of termination because such indefinite placement "fails to recognize the children's need for stability and permanency").

Considering the entire record, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in Troy's and Paul's best interest. We overrule Mother's sole issue challenging the sufficiency of the evidence to support the best-interest finding.

**CONCLUSION**

We affirm the decree terminating Mother's parental rights to Troy and Paul.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.