**Opinion issued March 19, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00907-CV

———————————

## IN THE INTEREST OF B. S. C. F. AKA B. F. C., Appellant

———————————

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case No. 2017-00823J

———————————

## MEMORANDUM OPINION

In this accelerated appeal, *see* TEX. FAM. CODE § 109.002(a–1); TEX. R. APP.
P. 28.1, 28.4, F.C. ("Father") challenges the trial court's decree terminating his
parental rights to his minor child, B.S.C.F. aka B.C.F. ("Betty"). Betty was placed
in the temporary managing conservatorship of the Department of Family and
Protective Services shortly after she was born. Her five half-siblings, none of

whom are related to Father, were already in the Department's custody due in large part to the deplorable living conditions in which a Department investigator had found them several months earlier. As the case proceeded, the Department discovered that K.W.F.R. ("Mother") had used cocaine while pregnant with Betty and had a pending felony drug charge in Louisiana state court. Three of Betty's half-siblings then accused Father of sexual abuse and various other misconduct, and a fourth half-sibling began to exhibit signs of past sexual abuse. Betty's half-siblings never retracted their outcries, which remained consistent throughout the case, and the trial court eventually terminated Father's parental rights to Betty. In three issues, Father contends that the evidence is legally and factually insufficient to support the trial court's findings under Section 161.001 of the Family Code. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (b)(2).

We affirm.

## Background

Mother has six children with three men: Brenda, Fred, Heather, Hailey, Kelly, and Betty.[1] Brenda, Fred, and Heather share the same father. Hailey and Kelly share the same father. Betty is the subject child of this suit. Father is Betty's biological father. He is not related to Mother's other children.

---

[1]    We refer to Mother's children by pseudonyms.

***Mother and Father move from Louisiana to Texas after Mother posts bail for a felony drug possession charge***

Mother and Father began dating in 2013. Around three years later, in early January 2016, Father moved in with Mother and her five children, Brenda, Fred, Heather, Hailey, and Kelly. At the time, they were living in Jefferson Parish, Louisiana. Betty was not yet born.

Shortly after Mother and Father started living together, Mother was pulled over while driving in Jefferson Parish. The police searched her vehicle and found over 70 grams of cocaine. Mother was arrested and charged with felony possession of a controlled substance and spent the next three days in jail. Mother then posted bond and was released on bail.

While on bail, Mother moved with Father and her five children from Jefferson Parish to Houston, Texas. Mother then failed to appear for a hearing in her drug case in Louisiana, and the Louisiana trial court revoked Mother's bail and issued a warrant for her arrest.

***The Department is appointed temporary managing conservator of Mother's five oldest children***

In May 2016, Mother took Brenda, then seven years old, to the emergency room. About a month earlier, Brenda had contracted headlice. Mother did not immediately seek treatment, and the infection progressively grew worse. Mother eventually attempted to treat the infection with kerosene, which irritated Brenda's

3

scalp and caused painful burning, prompting Mother to take Brenda to the emergency room. The hospital treated and discharged Brenda and then sent a referral to the Department accusing Mother of neglectful care.[2]

The Department sent an investigator to Mother and Father's home. The investigator described the conditions of the home as "deplorable." There was exposed wiring and a "massive hole" in the wall. There was no electricity or running water; the children said they were using the neighbor's hose to fill a bucket and bathe in the backyard. The children had no beds. The children had no food. And one of them sneaked out of the house through a window during the investigator's inspection.

The investigator interviewed Mother and Father. They told her that they had moved from Louisiana to Texas looking for work. Mother said that she did not use drugs and did not have a criminal record. She did not disclose that she was pregnant.

The Department filed a petition to terminate Mother's parental rights to Brenda, Fred, Heather, Hailey, and Kelly, who were then seven, five, four, three, and two years old. The Department was appointed temporary managing conservator of the five children. Brenda, Fred, and Heather were placed with their

---

[2]    We note that Mother is from Central America, where kerosene is a common remedy for headlice. Once common in the United States, kerosene has been displaced as a lice treatment by various modern licecides, which are safer and more effective.

biological father and stepmother. Hailey and Kelly were placed with a foster-to-adopt family.

Mother underwent a substance abuse assessment and again denied any drug use. Mother then submitted to drug testing and tested positive for cocaine. After testing positive, Mother admitted to using cocaine on at least three prior occasions. The Department investigated Mother's history in Louisiana and learned of her pending felony drug charge. The Department also learned that Mother was pregnant. The Department instructed Mother to inform the caseworker when the baby was born.

Mother gave birth to Betty in late November 2016. She did not notify the caseworker. Over the following two months, Mother failed to respond to the caseworker's inquiries, leading the Department to believe Mother was attempting to hide Betty's whereabouts. The Department eventually located Mother and Betty in early January 2017.

***The Department is appointed temporary managing conservator of Betty***

In February 2017, the Department filed a petition to terminate Mother's and Father's parental rights to Betty. The Department was appointed temporary managing conservator of Betty, and Betty was placed with the same foster-to-adopt family as Hailey and Kelly. The trial court later signed an order approving and requiring Mother and Father to follow family service plans prepared for them by

the Department. The plans included the statutorily-required admonishment that failure to comply could result in the termination of their parental rights.

***Mother's other children accuse Father of sexual abuse and other misconduct***

As the case proceeded, Mother's three oldest children accused Father of sexual abuse. The initial outcry was made in March 2017 by Brenda, who told her stepmother that Father had inappropriately touched her and her younger siblings. Brenda's stepmother reported the outcry to the caseworker, who, in turn, reported the information to the police and arranged for the children to be interviewed at The Children's Assessment Center. During the interviews, Brenda, Fred, and Heather confirmed that they had been inappropriately touched by Father.

After their outcries, the three older children made additional disclosures and allegations. Brenda disclosed that she had once been left alone at their house and that people had come to the house to do drugs. Fred disclosed that, at some point, he and his siblings had been living with Mother and Father in a hotel. Fred said that at the hotel he was exposed to pornography and that Mother and Father would have sex in front of him and his siblings. Both Brenda and Fred said that Father had guns. All three older children said they were scared of Father, did not feel safe around Mother, and were angry with Mother for not protecting them.

Meanwhile, the fourth child, Hailey, who had been placed with a different family, began engaging in behavior suggesting that she, too, had been sexually

6

abused or exposed to sexual abuse. Hailey began rubbing up on her dolls; touching her younger sister, Kelly, on her genitals (over her clothes); and acting out inappropriate touching and kissing. As a result, Hailey was placed in therapy.

The trial court suspended visitation for both Mother and Father.

### *The case is tried to the bench, and the trial court terminates Father's parental rights*

In February 2018, the case was tried to the bench. The evidence presented to the trial court included the medical records relating to Brenda's trip to the emergency room; the recorded CAC interviews of Brenda, Fred, and Hailey; the results of Mother's drug tests; and various documents relating to Mother's criminal history. Four witnesses testified: the caseworker, Mother, a special investigator, and Father.

**Caseworker's testimony.** The caseworker testified that Father had completed everything in his family service plan except the continued parenting classes. But, she admitted, his failure to do so was not necessarily his fault because the Department had delayed in arranging that service for him.

The caseworker stated that the Department sought termination of Father's parental rights to Betty because Father continued to be in a relationship with Mother even though Mother had endangered Betty and because Mother's older children had accused Father of sexual abuse. She testified that Father had admitted that he had been in a relationship with Mother for four years, which indicated that

7

he was aware of Mother's criminal history and drug use. She further testified that Father had failed to address the allegations of sexual abuse in counseling. She explained that Father adamantly denied any inappropriate contact with Mother's children and believed that the children's biological father had coached them into accusing him of sexual abuse. She admitted that the Department did not have any corroborating evidence aside from the children's outcries. But she also confirmed that the children never retracted their outcries of sexual abuse and were consistent throughout the entire case. And, she further noted, the fourth child, Hailey—who was not living with three older children—had exhibited signs of sexual abuse.

The caseworker testified that Hailey, Kelly, and Betty were thriving with their foster-to-adopt family and that Hailey's behavior had improved with therapy. She stated that the children's foster parents already had children of their own and wanted a big family. She testified that she believed Betty would regress if removed from her current home. She explained that Betty had bonded with her foster-to-adopt family and that they were the only family Betty knew.

**Mother's testimony.** Mother admitted that there was a warrant for her arrest for possession of cocaine. She stated that she had not taken care of the warrant because she had been in poor health. She further admitted that in January 2016 the police found cocaine during a search of her vehicle. She initially denied that she had to post bond to be released from jail, but she later admitted that her bond had

8

been revoked in that case. Mother said that she wanted the trial court to give her the opportunity to solve her problem with her warrant in Louisiana for her arrest.

Mother testified that she did not believe Father had sexually abused her children. Mother explained that during the times the abuse was allegedly occurring, she never left the children by themselves and never saw any sign of sexual abuse. She stated that the children never made an outcry to her. She further stated that Father did not own a gun and had never had one in front of the children.

Mother testified that she and Father owned a three-bedroom mobile home. She stated that it had running water and electricity and was suitable housing. She also stated that Father made sufficient income to provide for Betty.

Mother testified that she had told Father that she used drugs before she met him. She also acknowledged that she used drugs after she began dating Father, but she claimed that it had only been once and that Father was unaware of it. Mother testified that she began living with Father on January 5, 2016. She then acknowledged that she had been arrested for felony possession on January 13 and spent the following three days in jail. When it was brought to Mother's attention that she had been arrested eight days after she said she and Father began living together, Mother changed her testimony, said she had been mistaken about the date, and clarified that they moved in together on January 25, not January 5. Mother then testified that her children had stayed with friends when she was in jail.

**Special investigator's testimony.** The special investigator testified that she had assisted the attorney ad litem as an investigator and a child abuse expert. She testified that, in her opinion, Mother's and Father's parental rights should be terminated. She emphasized that Mother had a pending felony warrant, had left Louisiana while out on bond, and had a criminal record that included multiple convictions for theft and assault. And she emphasized that Father had been credibly accused of sexual abuse. The special investigator recounted the three oldest children's outcries and CAC interviews, and she opined that Hailey's conduct indicated that she had been sexually abused or witnessed sexual abuse.

**Father's testimony.** Father testified that he did not know about Mother's arrest for felony possession when he met her and that he only learned of it after they had started dating. He noted that he had once gone with her to pay a ticket, but he stated that he did not know what the ticket was for.

Father admitted that he was dating Mother when she was arrested in January 2016. He admitted that he knew Mother was out on bond when they moved from Louisiana to Texas. And he admitted that he knew Mother was supposed to appear at court in Louisiana when they were in Houston three months later. He testified that he did not know that Mother's bond had been revoked.

Father admitted that, when the children were removed from their home, the home had no electricity or running water, and the children were bathing outside

10

with a bucket. Father admitted that Mother had used cocaine while pregnant with Betty and that this constituted endangering conduct. He said that he did not know whether it was safe for Mother to be around the children and that he had remained in a relationship with her because he did not think they were going to have so many problems.

Father testified that if Mother was arrested for a possession charge, he would take care of Betty and the children. When asked how, he said that both he and Mother had family who could look after them while he worked. But he did not identify any particular relative who might be able to help. Father stated he had encouraged Mother to turn herself in for her active warrant, but he admitted that she had failed to do so in over two years.

After the trial, the trial court terminated Father's parental rights to Betty.[3] In its termination decree, the trial court found that termination of Father's parental rights was justified on grounds of endangerment and failure to comply with court orders and was in Betty's best interest. Father appeals.

**Sufficiency of Evidence**

In three issues, Father contends that the evidence is legally and factually insufficient to support the trial court's findings that (1) termination was justified on

---

[3] The trial court also terminated Mother's parental rights.

grounds of endangerment, (2) termination was justified on grounds of failure to comply with court orders, and (3) termination was in Betty's best interest.

## A. Applicable law and standard of review

Under Section 161.001 of the Family Code, the Department may petition a trial court to terminate a parent-child relationship. The trial court may grant the petition if the Department proves, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Section 161.001 lists 21 acts and omissions justifying termination of the parent-child relationship. *Id.* § 161.001(b)(1). "Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (internal quotation marks omitted) (quoting *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003)).

In determining whether termination is in the child's best interest, courts consider the nine nonexclusive factors listed by the Texas Supreme Court in *Holley v. Adams*: (1) the desires of the child, (2) the emotional and physical needs of the

child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. 544 S.W.2d 367, 371–72 (Tex. 1976).

Further, "the same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interests of the child." *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

In a legal-sufficiency review in a parental-rights-termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*

13

In a factual-sufficiency review in a parental-rights-termination case, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). By focusing on whether a reasonable factfinder could form a firm conviction or belief, the appellate court maintains the required deference for the factfinder's role. *Id.* at 26. "An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.* We should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B. Sufficiency of predicate finding

We begin by considering Father's first issue in which he contends that there is legally and factually insufficient evidence to support the trial court's finding that termination was justified on grounds of endangerment under subsections (D) and (E). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). We focus our analysis on subsection (E). Termination is justified under subsection (E) if the trial court find

that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Within the context of subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*

It is not necessary to establish that a parent intended to endanger a child to support termination under subsection (E). *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). "Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section E has been established." *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also Walker*, 312 S.W.3d at 617 (same).

The endangering conduct does not have to occur in the child's presence. *Walker*, 312 S.W.3d at 617. The conduct may occur before the child's

birth and either before or after the child's removal by the Department. *Id.* A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Here, there is evidence that Father engaged in endangering conduct by sexually abusing Mother's older children and exposing them to sexually inappropriate conduct and material. *See Jordan*, 325 S.W.3d at 724 (evidence regarding how parent treated other children is relevant when determining whether termination is justified on grounds of endangerment); *Walker*, 312 S.W.3d at 617 (same); *see also Wyatt v. Dep't of Family & Protective Servs.*, 193 S.W.3d 61, 68 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (proof of endangering conduct against mother's older children could support finding under subsection (E) as to newborn even though child was taken from mother at birth). This evidence includes:

- Brenda's initial outcry that Father had inappropriately touched her and her younger siblings;

- Brenda, Fred, and Heather's subsequent CAC interviews, in which they confirmed that they had been inappropriately touched by Father and exposed to pornography and sex while living in the hotel;

16

- Brenda, Fred, and Heather's statements to the caseworker that they did not feel safe with Mother and feared Father; and

- Hailey's sexualized touching and play, which the caseworker and special investigator explained was indicative of past sexual abuse.

Father argues that this evidence is insufficient to support a finding of endangerment because there were no criminal charges filed against him and no physical evidence to corroborate the children's outcries. We disagree.

Evidence that Father had been charged with sexual assault or indecency was not necessary to show that Father had inappropriately touched the children. *See In re H.D.*, No. 01-12-00007-CV, 2013 WL 1928799, at *11 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.) (holding that proof of criminal charges filed in response to child's sexual abuse outcry was unnecessary to establish endangerment). Although there was no physical evidence to corroborate the children's statements, there was evidence that indicated the children were being truthful. The children never retracted their outcries and remained consistent throughout the case. And Hailey showed signs of sexual abuse even though she never made an outcry and was placed with a different family than her three older siblings, undercutting Father's theory that Brenda, Fred, and Heather's biological father coached them into accusing him of sexual abuse.

There is also evidence that Father engaged in endangering conduct by failing to protect Betty and her half-siblings from Mother's illegal drug use and other

illicit activity in their home. *See In re S.K.A.*, No. 10-08-00347-CV, 2009 WL 2645027, at *9 (Tex. App.—Waco Aug. 19, 2009, no pet.) (mem. op.) (holding father's failure to protect unborn child from mother's drug use sufficient to establish endangerment under subsection (E)). Although Mother and Father provided testimony indicating that Father did not become aware of Mother's drug use until after this case had been filed, the trial court could have reasonably disbelieved such testimony given the other evidence presented. First, Mother's oldest child, Brenda, disclosed that people came to the home to do drugs, which suggests that drug use occurred openly in the home. Second, Mother initially testified that she started living with Father on January 5, 2016—eight days *before* she was arrested for felony possession of cocaine. Third, Mother tested positive for cocaine while pregnant with Betty and later admitted to past cocaine use. On this evidence, the trial court, as factfinder, could have reasonably found that Father knew Mother was involved in illegal drug behavior, knew it was going on in their home, and did nothing to prevent Betty and her half-siblings from being exposed to the dangers from such activity.

We hold that there is legally and factually sufficient evidence to support the trial court's finding that termination was justified under subsections (E). Therefore, we overrule Father's first issue without addressing whether there is legally and factually sufficient evidence to support termination under subsection (D). Father's

18

second issue challenges the sufficiency of the evidence for the alternative predicate finding—that termination was justified for failure to comply with a court order under subsection (O). *See* TEX. FAM. CODE § 161.001(b)(1)(O). However, because we have found that the evidence is both legally and factually sufficient to support the predicate finding of endangerment, we need not address Father's second issue. *See In re A.M.*, 495 S.W.3d at 580.

## C.    Sufficiency of best-interest finding

Next, we consider Father's third issue, in which he contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in Betty's best interest. We consider the evidence supporting each of the nine non-exhaustive *Holley* factors.

**First factor: Betty's desires.** Father correctly states that Betty is too young to express her desires. He admits that she is presumably bonded to her foster parents. But he also contends that she is presumably bonded to him as well and that this weighs in his favor. We disagree.

"When children are too young to express their desires, the factfinder may consider whether the children have bonded with the proposed adoptive family, are well-cared for by them, and whether they have spent minimal time with a parent." *See In re T.M.*, No. 01-16-00942-CV, 2017 WL 1885406, at *9 (Tex. App.—Houston [1st Dist.] May 9, 2017, pet. denied) (mem. op.). Here, it is undisputed

that Betty has bonded with her proposed adoptive family, is well-cared for by them, and has spent minimal time with Father. Betty was removed as an infant and has been with her current foster-to-adopt parents for the majority of her life; they are the only family she knows. There is no basis to presume Betty has bonded with Father because the trial court suspended his visitation after Mother's other children accused him of sexual assault.

**Second factor: Betty's present and future emotional and physical needs**. Father admits that Betty is "thriving" with her foster family and that "all of her physical and emotional needs are being met." But he contends there is no guarantee that her foster family will continue to satisfy her physical and emotional needs and that this weighs in his favor. We disagree. Father does not support his contention with any evidence; it is purely speculative. And the evidence that is in the record—including the evidence of sexual abuse and the deplorable condition of the home at the beginning of the case—indicates that it is Father who may be unable to satisfy Betty's emotional and physical needs.

**Third and eights factors: the present and future emotional and physical danger to Betty and acts or omissions indicating an improper parent-child relationship**. Father admits that Betty's foster home is safe and stable. But he again contends that there is no guarantee it will remain safe and stable and that this weighs in his favor. And again, we disagree. Father does not base his contention on

20

any evidence. He disregards the evidence indicating that he would pose a danger to Betty if reunited with her. As discussed, the evidence would permit a reasonable factfinder to find that Father sexually abused Mother's children and placed them in an unsafe environment and failed to prevent Mother from using cocaine while pregnant with Betty. Such inappropriate conduct in the past permitted the trier of fact to infer that behavior would continue to be a threat for Betty in the future. *See Jordan*, 325 S.W.3d at 724 ("Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future.").

**Fourth factor: the parental abilities of the individuals seeking custody**. Father acknowledges that Betty's foster parents want to adopt Betty and her two other siblings. And he admits that they have demonstrated adequate parenting skills. But he suggests this factor nevertheless weighs in his favor because he wants to parent Betty, too. This disregards the danger Betty's older siblings experienced while Father was living them—namely a home without running water or electricity and exposure to drugs, pornography, and other illicit behavior. The evidence of Father's past bad parenting permitted an inference that Father's bad parenting would continue in the future.

**Fifth factor: the programs available to assist these individuals to promote the best interest of the child**. Father states, "presumably," he "would be

21

given a modified [family service plan] upon restoration of his parental rights." But he fails to identify the programs that would be offered under such a plan.

**Sixth and seventh factors: the plans for the child by these individuals or by the agency seeking custody and the stability of the home or proposed placement**. Father admits that Betty's foster home is safe and stable and that her foster parents have appropriate plans for her future. He further admits that his plans for Betty's future are unknown. The only plan he suggested was that he would take care of Betty, but his actions showed he was inappropriate in his idea of care. In the meantime, Betty and her two siblings were thriving with the foster parents who wanted a big family and wanted to adopt Betty with her two siblings. Because the need for permanence is a paramount consideration in determining a child's present and future needs, the trial court had more than sufficient basis to find termination of Frank's parental rights was in Betty's best interest. *See* TEX. FAM. CODE § 263.307(a) ("In considering the factors established by this section, the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.").

**Ninth factor: any excuse for the parent's acts or omissions**. In his brief, Father admits that he "has no excuses for his acts or omissions."

Considering the *Holley* factors and reviewing all of the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of

22

fact could have formed a firm belief or conviction that termination of Father's parental rights was in the best interest of Betty. Moreover, none of the disputed evidence was so significant that the factfinder could not have formed such a firm belief or conviction. We therefore conclude that the evidence was both legally and factually sufficient to support termination of Father's parental rights to Betty. We overrule Father's third issue.

## Conclusion

We affirm the trial court's decree.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.