Crystal Lee WYATT, Appellant,

v.

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,**
Appellee.

Nos. 01–05–00213–CV, 01–05–00214–CV, 01–05–00373–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 16, 2006.

Crystal Wyatt, Miriam Judith Riskind, Isenberg & Riskind, Houston, TX, for Appellant.

Patricia Lee Flenniken, Department of Family & Protective Services, Sandra D. Hachem, Sr. Asst. Co. Atty., Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

## OPINION

SAM NUCHIA, Justice.

Appellant, Crystal Lee Wyatt, appeals the termination of her parental rights to

her children, D.R.A., M.S., and A.W.[1] Appellant challenges the legal and factual sufficiency of the evidence to support the trial court's judgments. We affirm.

## BACKGROUND

Appellant's first child, D.R.A., was born when appellant was 15 years old. When D.R.A. was about one year old, the Department of Family and Protective Services (hereinafter "CPS") removed him from appellant and placed him with his father, Roy Apps, after discovering a serious burn, for which appellant had not sought medical treatment, on D.R.A.'s foot. When D.R.A. was five years old, CPS learned that Apps had been charged with sexual abuse of his teen-aged daughter. In July 2003, CPS removed D.R.A. from Apps's possession and returned him to appellant. At this time, appellant had a second child, M.S., was pregnant, and had no employment or permanent place to live. Stacy Ahmed, a licensed social worker and CPS caseworker, was assigned as appellant's caseworker. Ahmed did a family assessment, during which appellant said that she had used cocaine, heroin, and PCP in the past. Ahmed included this information in her report.

In August 2003, Ahmed went to the motel where appellant and her children were staying and found appellant upset and yelling at D.R.A., who was in the bed with the sheet covering him up to his eyes. Ahmed also saw that M.S., who was about 17 months old, had a serious burn on her arm. Appellant said that M.S. had burned herself with the curling iron. Ahmed asked if appellant had taken M.S. to the doctor. Appellant said that she had not, but that M.S. was fine. When Ahmed insisted that they take M.S. to the doctor, appellant became angry and began yelling at Ahmed. Finally, appellant agreed to go to the nearby CPS clinic if Ahmed would first pick up appellant's friend, Kim Jackson. At the clinic, the doctor examined M.S. and told Ahmed that the injuries were not consistent with appellant's explanation of the occurrence. When informed of this, appellant again became angry, and a security guard was called because of the disturbance. While waiting to see the doctor, Ahmed checked the messages on her cell phone and found a message that had been left by appellant the previous evening. Appellant was saying that she was "tired of this shit" and that CPS could come pick up D.R.A. and she was taking M.S. to her daddy's house. Ahmed was concerned about M.S.'s injury and appellant's behavior. She was also concerned because of appellant's history with CPS and possible drug abuse, which appellant denied. Ahmed called her supervisor and, after a discussion with her supervisor, took the children into protective custody.

Appellant gave birth to A.W. on October 31, 2003. Because of the risks already existing, CPS took immediate custody of A.W. Initially, appellant told her new caseworker, Rebecca Moore, that she was going to give A.W. to someone, but she later changed her mind. A.W. was born

---

1. D.R.A. is the subject of appeal No. 01–05–214–CV, trial court cause number 1998–05671J. M.S. is the subject of appeal No. 01–05–00213–CV, trial court cause number 2003–06758J. A.W. is the subject of appeal No. 01–05–00373–CV, trial court cause number 2003–09011J. The causes relating to M.S. and A.W. were tried together to the court on January 26 and 28, 2005. The cause relating to D.R.A. was tried to the court on February 8, 9, and 11, 2005. Although there were two separate trials, the same witnesses testified to the same or similar facts in both trials, with one exception: an occupational therapist assistant testified regarding her work with A.W., a child with special needs. The attorneys representing the Department of Family and Protective Services were the same in both trials, and the attorney ad litem for the children was the same.

with heart problems and was diagnosed as being developmentally delayed, showing deficits in her physical and mental development. From the age of three months, A.W. saw an occupational therapist twice a week and, at the time of trial, was also seeing a speech therapist twice a week. Thus, her foster parents must take her to therapy four days a week. At the time of trial, A.W. showed improvement, although she still did not have coordination or cognitive skills appropriate for a 15–month–old child.

Because Moore thought that appellant did not understand the extent of A.W.'s special needs, she spoke to appellant about it at each monthly visit. At a court hearing, Moore again brought up the subject of A.W.'s special needs and the therapy A.W. was receiving. Appellant yelled at Moore and said that she didn't understand why Moore kept bringing up the subject. Moore responded that appellant needed to know the information to provide for A.W.'s needs.

From the time that CPS took possession of appellant's children until the time of the first trial, appellant lived in a number of locations, staying in one place from a few weeks to three or four months. These places included the home of her aunt, the home of her grandmother in Liberty, an apartment owned by her uncle, her godmother's home, and an apartment she shared with her friend, Kim. She left the home in Liberty because she had a fight with her grandmother, and she moved out of one apartment because she fought with some old acquaintances who moved into the neighborhood. Moore wrote a letter to help appellant get government-subsidized housing and gave appellant copies of the children's birth certificates and social security cards. Appellant lost all these documents and called Moore to get additional copies. At the first trial, appellant said

she had obtained the government-subsidized housing, but had not moved in because the electricity was not yet turned on because she gave the electric company the wrong address. She moved into the apartment a few days before the second trial began.

After removing the children from appellant's possession, CPS arranged for supervised family visitation twice a month. Because A.W. was taken from appellant immediately after birth, CPS arranged for appellant to visit her once each week. However, appellant did not show up for many of these additional visits and told CPS that she wanted to visit all the children together.

Appellant also missed many of her visits with the children. Moore testified that appellant attended only 20 of 34 possible visits with A.W. Moore estimated that appellant attended 25 of 30 possible visits with D.R.A. and that she was about 25 or 30 minutes late for 5 of those visits. On several occasions, appellant called Moore 10 or 15 minutes before the meeting time to say that she would not attend, usually because of the lack of transportation. Because the foster families lived about one hour from Houston, this late cancellation resulted in their making a needless trip. Moore also testified that appellant left some of the visits early, saying that she had some other appointments. When appellant did attend, she was almost always accompanied by one of two friends, Kim or Mike, who had given her a ride and then participated in the visits. The friend would sit on the floor and play with the children while appellant sat on the sofa and waited for the children to come to her. Appellant was observed being highly critical of D.R.A. regarding his appearance, saying his hair was ugly, his breath stank, and his nails were dirty and also saying, in his presence, that she did not want him.

Her treatment of D.R.A. improved somewhat after appellant's parenting classes.

Appellant's employment history, as it appears in the record, consisted of a part-time job with a home health service and a job at Wendy's. The home health service job, which paid $5.50 an hour, began in June or July 2004 and lasted about two months. Appellant said that she worked about 10 hours a week and quit the job because of the hours and the pay. Appellant testified that the job at Wendy's, which paid $6 an hour, began as part time and became full time in the middle of December. However, she also testified that she worked only 28 to 30 hours a week and agreed that that was part time. At the first trial, appellant testified that she had not been to work in almost three weeks. She said that she had been in the hospital for a couple of days and had not returned to work since because she thought she was going to have surgery. Nevertheless, she was certain that she still had the job. At the second trial, she said that she had started working again the previous week.

The record reveals that appellant has a significant problem with anger. Appellant was observed yelling or creating a disturbance at the motel where she was living with her two older children, at the clinic where M.S. was taken for treatment, at a family visitation, during telephone calls with her caseworker, in a confrontation with her CPS volunteer, and at court hearings. Appellant participated in an anger management program, and when she completed it, was supposed to continue working on anger management through her therapist. Appellant testified that she learned several ways to manage her anger, but that she did not use those techniques because she did not have an anger problem.

Appellant's trial date was continued twice at Moore's request because Moore thought appellant was making progress in the services being offered to her and wanted to give appellant more time to complete the services. At an October 2004 hearing, the trial court ordered appellant to pay $50 per month child support for M.S. Appellant never made any payments and explained during the first trial that she could not afford them. However, she testified that she spent $500 on Christmas gifts for the children that year.

Appellant was also ordered to pay $50 child support for D.R.A. At the second trial, when asked why she had not made any payments for D.R.A., she stated, "It's not that I couldn't. [It's] that I didn't want to. I'll put it like that.... And I can't apologize for it. It's just that I didn't feel like bringing the money down here."

Other services CPS required appellant to participate in were parenting classes and drug assessment and treatment. Appellant apparently told the drug assessment agency that she had only used alcohol and marijuana. Moore testified that she was concerned that appellant's drug assessment was not accurate and that she should be reassessed because the CPS file showed that appellant had told Ahmed that she had used PCP, cocaine, and heroin.

At the second trial, appellant testified that she did not tell Ahmed that she had used the "exact drugs. I told her the drugs that I used that was inside that. It was, like, called 'drank' and that's what she had got it misunderstood by that." She said that "Drank" is codeine with promethazine, that it has heroin, cocaine, and PCP inside, and that it is a drink. She said that she did not explain this to the drug assessor because the assessor did not ask.

Appellant participated in and completed both the parenting classes and the drug

treatment services. She was also required to submit to random urinalyses. In October 2004, after she had completed the drug treatment program, one of her urinalyses was adulterated, indicating that appellant might have been attempting to hide something. The re-test was also adulterated. Appellant was ordered to have a hair-follicle test, but the testing agency was unable to contact her, and she did not contact the agency even though Moore had given her the necessary information. On January 21, 2005, five days before appellant's first trial, her urinalysis was positive for marijuana and cocaine.

Appellant was not present for the first day of the first trial. Her attorney explained that appellant had just returned from an emergency trip to Liberty to care for her grandfather and had no transportation to court. After clarifying that appellant was in town, the trial court denied appellant's motion for a continuance. On the second day of trial, the proceedings were to begin at 9 a.m. Appellant arrived late and was sworn in at 10:55 a.m.

At the first trial, appellant testified that she believed she had shown stability in her employment and her housing because, when she could move into her new apartment, which was to cost only $48 per month, she would have everything under control. Admitting that in the past she had not stayed in one place more than a few months, she said that things would be different now because she had a job. Appellant testified that she had arranged for her children to be in a government-subsidized day-care program that is open 24 hours a day and provides transportation for the children. She further testified that she would get Medicaid for the children and that friends would provide furniture for her apartment.

Appellant testified that things had changed since December because her mother had gotten a car and could provide transportation. However, appellant said that she would not let her mother baby-sit with the children because her mother had been abusive to appellant and her brother when they were children.

Although appellant said that she did not know A.W.'s medical and developmental needs, she said that she would not have a problem with taking A.W. to his therapy four days a week. However, she admitted that she has a hard time getting to places on time.

When asked about the positive results on her latest urinalysis, appellant said that she had smoked marijuana at her birthday party on January 12 because she just wanted to have fun. She denied using cocaine and implied that someone at the party must have "laced" something. She said she would not continue using any drugs. She admitted that, when she smoked the marijuana on January 12, she knew that any drug use would jeopardize her chance of getting her children back.

Appellant admitted that, at first, she did not want her children to be returned and was not trying to follow CPS's program. She testified that she now wants her children and thinks she can be a good mother.

## DISCUSSION

### Standard of Review

The natural right that exists between parents and their children is one of constitutional dimensions. *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). To terminate the parent-child relationship, a court must find by clear and convincing evidence that the parent has committed one of the acts or omissions listed in section 161.001(1) of the Family Code and that termination is in the best interest of the child. *See* Tex. Fam.Code Ann. § 161.001(1), (2) (Vernon Supp.2005). The

failure to prove either of these elements will prevent termination of a parent's rights. *See In re U.P.*, 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) ("Proof of one element does not relieve petitioner from establishing the other."). If we determine that the trial court's termination was proper under any one of the subsections of section 161.001(1), we need not reach the challenges to any of the remaining subsections. *Avery v. State*, 963 S.W.2d 550, 552 (Tex. App.-Houston [1st Dist.] 1997, no writ).

■■■ In termination-of-parental-rights cases, the State must support its allegations by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599 (1982); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex.2003). The proof must produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002). In reviewing a termination-of-parental-rights case for legal sufficiency, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *Id.* at 266. In a factual-sufficiency review, we "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." If that evidence is "so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

### Appellant's Conduct

■■■ In her second issue relating to M.S. and A.W. and her first issue relating to D.R.A., appellant contends that there was no evidence or, in the alternative, insufficient evidence to support a finding by the trial court [2] that appellant engaged in conduct that endangered the physical and emotional well-being of the children, pursuant to section 161.001(1)(E) of the Family Code. *See* TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2005). In her argument relating to M.S. and A.W., appellant discusses her anger issues without relating that anger to any possible effect on the children. Appellant then argues that there was no relevant testimony regarding her conduct with M.S. and A.W., except that she had brought to visitation friends who interacted with the children

---

2. Appellant did not request and the trial court did not file findings of fact and conclusions of law. *See* TEX.R. CIV. P. 299a. Therefore, we presume that the trial court made all the findings necessary to support the judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990); *see also In re J.F.C.*, 96 S.W.3d 256, 263 (Tex.2002) (in absence of separately filed finding, deeming finding that termination is in children's best interest). In each of its judgments, the trial court recited the following:

8.1. The Court finds by clear and convincing evidence that termination of the parent-child relationship, if any exists or could exist, between the mother, CRYSTAL LEE WYATT, and [the children] the subject of [these suits], is in the best interest of the [child].

8.2. Further, the Court finds by clear and convincing evidence that CRYSTAL LEE WYATT has:

8.2.1. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(1)(E) of the Texas Family Code;

8.2.2. [regarding compliance with provisions of a court order pursuant to § 161.001(1)(O) of the Texas Family Code.]

We will review the evidence to determine whether any actions by appellant endangered the physical or emotional well-being of the children and whether termination was in the best interest of the children.

more than appellant did, and that there was no evidence of how this harmed the children. Appellant points out that A.W. was removed from appellant at birth and that there is no evidence that appellant did anything to harm her. Regarding her failure to disclose, during her drug assessment, her prior use of PCP, cocaine, and possibly heroin, appellant simply asserts that she had complied with the requirements of her plan except for the one positive urinalysis. In her argument relating to D.R.A., appellant discusses her various moves and states that there is no evidence of the conditions of these homes or that the conditions harmed D.R.A. Appellant's arguments miss the point.

Both of the children that appellant had in her custody for any length of time—M.S. and D.R.A.—had severe burns, and these burns were never satisfactorily explained. Appellant said that she was not at home when D.R.A. was burned. She said that M.S. burned herself with a curling iron, but she never explained how M.S. got the hot curling iron. Furthermore, she did not take either child for any medical treatment of the burns. In addition, she resisted when her caseworker insisted on taking M.S. to a clinic and agreed to go only on the condition that her friend Kim go with them. At the clinic, the doctor said that the burns were not consistent with appellant's explanation. Given the similarity of the two incidents, appellant's conduct showed a pattern that had not changed in the intervening four years. A reasonable factfinder could have formed a firm belief that appellant's failure to take D.R.A. and M.S. for medical treatment and to resist going to a clinic with the caseworker endangered the physical well-being of D.R.A. and M.S.

Furthermore, a factfinder could have reasonably believed that appellant's angry outbursts, which occurred frequently and apparently without regard to her surroundings, endangered the emotional well-being of the children. Ahmed witnessed D.R.A. cowering under a sheet as appellant yelled at him, and M.S., being in the same room, was a witness to this event. The children were also present when appellant created disturbances at the family visitation and the health clinic.

Appellant argues that there is no evidence to show that her conduct endangered A.W. because A.W. was taken from her at birth. However, a court may consider a parent's conduct both before and after a child's birth as grounds for termination. *In re U.P.*, 105 S.W.3d at 229; *see also Avery*, 963 S.W.2d at 552–53 (determining that prior conduct that endangered older child and persisted up until birth of second child was basis for termination of parental rights of second child).

In this case, appellant showed a pattern of medical neglect with her first two children as well as a pattern of angry disturbances. A factfinder could have reasonably believed that appellant's conduct endangered the physical and emotional well-being of A.W.

We hold that the evidence is legally sufficient to support the trial court's judgments. Furthermore, we find no evidence presented by appellant disputing the evidence presented by CPS. Appellant admitted that her children's burns were serious and that she did not attempt to get medical treatment for them, but gave no reason for her failure to do so. Appellant did not deny her angry outbursts, although she minimized some of them. Rather, she denied that she had an anger "problem" and therefore does not use any anger management techniques. In light of these facts, we conclude that the trial court could have reasonably formed a firm belief that CPS's allegations were true.

Accordingly, we overrule appellant's second issue relating to M.S. and A.W. and her first issue relating to D.R.A.

**Best Interest of the Children**

In her fourth issue relating to M.S. and A.W. and her third issue relating to D.R.A., appellant contends that there was no evidence or, in the alternative, insufficient evidence to support the finding that it was in the children's best interest to terminate the parent-child relationship. Appellant argues that, in the case of A.W., there is no evidence that appellant harmed her or that she had drugs in her system or showed signs of prenatal neglect when born. Appellant further argues that there is no evidence that M.S. suffered lasting effects from her burn. With regard to D.R.A., appellant seems to argue that her efforts to complete her family service plan controvert the caseworker's testimony. Appellant appears to suggest that the children could simply stay in foster care until appellant could attempt reunification or that CPS could be made the children's permanent managing conservator without terminating appellant's parental rights by stating that there is no evidence that such a course of action would harm the children emotionally or physically. In our view, appellant's argument fails to recognize the children's need for stability and permanency.

Courts have generally considered nine non-exclusive factors set out in *Holley v. Adams* in determining the best interest of the child. 544 S.W.2d 367 (Tex.1976). Those factors are (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent, which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372. We will consider these factors as they relate to this case.

1. *Desires of the children.* These children are very young. M.S. was removed from her mother's custody when she was 17 months old and was not yet three years old at the time of trial. A.W. was removed at birth and was 15 months old at the time of trial. D.R.A. was first removed from appellant when he was about one year old and was returned to her possession for about one month when he was five years old, and the caseworker testified that D.R.A. and appellant were not bonded. The record is silent regarding the children's desires.

2. *Emotional and physical needs of the children now and in the future.* A.W. is developmentally delayed both physically and intellectually. At the time of trial, she was receiving therapy four days a week. Appellant got angry with her caseworker because the caseworker tried to discuss A.W.'s special needs on each visit. Appellant admitted at trial that she did not know A.W.'s needs, but thought she would be able to take A.W. to therapy as required, even though she had problems getting to appointments on time.

D.R.A. and M.S. have no special needs. However, appellant has demonstrated that she has difficulty fulfilling the ordinary needs of a very young child by her reluctance to and revulsion at changing M.S.'s diaper during a visitation. Appellant also demonstrated that she did not understand the needs of a young child in her harsh criticism of D.R.A. Although appellant improved in her communications with

D.R.A. after taking parenting classes, she still was unable to bond with him. In addition, appellant demonstrated an inability to set priorities in tending to her children's needs by spending $500 on Christmas gifts, but saying that she could not pay $50 per month in child support. Finally, the caseworker testified that the children all needed stability, and, over the 17 months that CPS was working with her, appellant did not show stability either in her living arrangements or in her employment.

3. *Emotional and physical danger to the children now and in the future.* Appellant's anger issues, coupled with her denial that she has a problem with anger, could lead to the conclusion that, now and in the future, her anger presents at least an emotional, and probably a physical, danger to the children. This danger is further exacerbated by appellant's lack of candor during her drug assessment and her continuing use of illegal drugs. Although she testified that she would not continue using drugs, her positive test for cocaine and marijuana only five days before trial indicates that she is likely to continue her drug use whenever she wants to "have fun."

4. *Parental abilities of the individuals seeking custody.* Appellant's parenting experience consisted of approximately one year with D.R.A. before he was removed from her for medical neglect, approximately one additional month with D.R.A. four years later, and 17 months with M.S. Appellant was observed yelling at D.R.A. on one occasion and severely criticizing him at visitation for his "ugly hair" and his personal hygiene. Appellant tried to avoid changing M.S.'s diaper, saying it was "gross." Appellant brought friends with her to visitation, and the friends interacted with the children while appellant sat on the sofa and waited for the children to come to her. Although some improvement was noted after appellant completed her parenting classes, there was no significant change in her interaction with the children at visitation.

5. *Programs available to help promote the best interest of the children.* Appellant recognized that she would need day care for the children while she was at work and arranged for subsidized day care at a facility that provided transportation and was open 24 hours a day. Appellant testified that she would not have a problem taking A.W. to therapy four times a week, although she admitted that she had trouble getting places on time. The record shows that, not only is she late, she often does not show up at all, *e.g.,* the first day of trial, visits with her children, and two weeks at work.

Appellant did not seem to recognize that she needed programs to help with her parenting skills. She did not appear to benefit much from the anger management program and denied that she had an anger problem. She seemed to gain only slight benefit from the parenting classes, criticizing D.R.A. less but not increasing her interaction with the children. After completing her drug program, she had an adulterated urinalysis and a positive urinalysis. She stopped attending a support group at Houston Area Women's Center because she felt that she did not need it. In general, appellant showed a disregard for the measures she needed to take to regain custody of her children.

6. *Plans for the children by those seeking custody.* Appellant had plans to move into subsidized housing that would cost $48 a month, enroll the children in subsidized day care, get Medicaid for the children, get her mother to help with transportation, and continue to work at Wendy's for a time so she could pay her bills. However, appellant did not say how she planned to

pay the electricity bill, which would not be subsidized and had been a problem for her in the past. And although her mother could help with transportation, appellant said she would not let her mother stay alone with the children because of the mother's abusive behavior during appellant's childhood.

On the other hand, CPS planned to place the children for adoption in homes that could provide for their needs. M.S. and D.R.A. were already placed with a foster family that wanted to adopt them, and Moore testified that they were doing well in the foster home and were bonding with the parents. A.W. was with a foster family that was satisfying her needs and taking her to her scheduled therapy sessions. CPS had placed A.W. on a list for adoption. Viewing all the evidence, the court could have reasonably believed that CPS's plans for the children would be more likely to result in a permanent and stable home.

7. *Stability of the home or proposed placement.* Since 2003, appellant had not lived in one place for more than three or four months. She sometimes had her own apartment, but more often she moved in with friends or relatives. On at least one occasion, she was staying in a motel. This situation persisted up until the time of the first trial. Although appellant had moved into her own subsidized apartment a few days before her second trial and testified that things would be different because she had an apartment and a job, a factfinder could have reasonably believed that four or five days in an apartment was insufficient to demonstrate stability.

8. *Acts or omissions of the parent that indicate an improper relationship.* Appellant either did not know or would not tell how either of her two older children got burned. She then did not take either of them for medical treatment for their

burns. Appellant showed revulsion at having to change a wet diaper. She did not interact much with her children at visitation, but left that to friends who came with her. At the time the two older children were taken by CPS, she had no home and was staying in a motel. She smoked marijuana about two weeks before her first termination trial, knowing that she was jeopardizing her chance of getting custody of the children. She also tested positive for cocaine. She did not make a serious attempt to get a permanent place to live until shortly before her first trial, but, for most of the 17 months before the trial, lived with various friends and relatives and did not secure a permanent place to live until after her first trial. She was unemployed for about 10 months after CPS took possession of the children and never got a full-time job.

9. *Any excuse for the acts or omissions of the parent.* Of the acts and omissions above, appellant offered excuses for only two. She said that she did not take M.S. to the doctor for M.S.'s burns because she was afraid that CPS would remove M.S. from her custody. She also said that she did not use cocaine and that someone at the party must have "laced" something. At trial, appellant admitted that, at first, she was not trying to comply with CPS's plan of service, but said that she now wants her children back and "I know that I will be able to do what I can do when I get my kids."

Except for the desires of the children, which is unknown, each of the above factors weighs in favor of CPS. A factfinder could have reasonably believed that the termination of appellant's parental rights was in the best interest of the children.

The only evidence offered by appellant to dispute such a conclusion was appellant's assurance that she could take A.W. to her scheduled therapy, that she had

made arrangements for day care and a suitable place to live, that she would have help with transportation, and that she now wanted very much to have her children back. We hold that this evidence is not so significant that a factfinder could not reasonably have formed a firm conviction that termination was in the best interest of the children.

We overrule appellant's fourth issue relating to M.S. and A.W. and her third issue relating to D.R.A.

## CONCLUSION

Having concluded that there is legally and factually sufficient evidence that appellant's conduct endangered the well-being of D.R.A., M.S., and A.W. and that termination of appellant's parental rights is in the best interest of the children, we need not consider her first, third, and fifth issues relating to M.S. and A.W. or her second and fourth issues relating to D.R.A., in which she challenges the legal and factual sufficiency of the evidence to support the trial court's findings or implied findings with respect to other subsections of section 161.001(1).

We affirm the judgments.