**Opinion issued April 23, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00908-CV

———————————

## IN THE INTEREST OF J.T., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-07436J**

---

## MEMORANDUM OPINION

The trial court terminated the parental rights of the mother and father with respect to their son, J.T. The father has not appealed but the mother has done so. She contends that the evidence is legally and factually insufficient to show that:

- she knowingly placed or knowingly allowed J.T. to remain in conditions or surroundings that endangered his physical or emotional wellbeing;

- she engaged in conduct or knowingly placed J.T. with persons who engaged in conduct that endangered his physical or emotional wellbeing;

- termination of her parental rights is in J.T.'s best interest.

We affirm.

## BACKGROUND

This termination case was tried to the bench in October 2019. Several witnesses testified for the Department of Family and Protective Services, including two caseworkers, a drug-testing expert, J.T.'s guardian ad litem, and a person interested in adopting J.T. The mother testified on her own behalf. The father was not present at trial.

J.T. was born in May 2012. The Department subsequently received several allegations of abuse or neglect.

The Department received allegations that J.T.'s parents "were using drugs and blowing marijuana smoke in the infant's face" in January 2013. But the Department was unable to complete its investigation of these allegations because J.T.'s parents moved, and the Department could not find them afterward.

In April 2014, the Department received allegations that J.T.'s parents were using methamphetamine and engaged in "constant marijuana use" in his presence. Once again, the Department could not complete its investigation because the parents moved, and the Department could not find them.

Later that year, in December 2014, the Department received allegations that J.T.'s parents took him to a location known for drug-related activity and that his father was using J.T. to panhandle. In addition, J.T.'s parents allegedly were unable to feed him and were on the brink of homelessness. Like the prior allegations, the Department was unable to complete its investigation because the parents moved, and the Department could not find them.

In May 2015, the Department received allegations that J.T. had been sexually abused. J.T.'s mother alleged that his father was abusing him, but she did not want J.T. to be examined. Based on these allegations and the Department's perception that the mother was slow to act on her suspicion of sexual abuse, which the mother disputed, the Department removed J.T. from his parents' home in December 2015 and placed J.T. in foster care. The mother satisfied the requirements of her family service plan, which included education as to domestic violence because she had been subject to domestic violence by J.T.'s father. J.T. was subsequently returned to his mother's sole custody in January 2017.

About a month later, in February 2017, the Department received allegations of neglectful supervision, drug abuse, and domestic violence in J.T.'s presence. Its investigation did not corroborate the allegations of neglectful supervision or drug use. The mother took a drug test, and her test results were negative. J.T. looked healthy.

But the mother confirmed the accuracy of the domestic violence allegation. Her boyfriend, Fabian, broke windows and broke down her apartment's door while J.T. hid in a bedroom. Once inside the apartment, the mother's boyfriend hit her in the lip, the left side of her face, and one of her arms. According to the mother, J.T. did not witness the actual assault, which happened in the living room. The police arrested the boyfriend for domestic violence. As a result, the mother's family service plan once again included counseling for domestic violence.

In April 2017, when the assigned caseworker spoke with the mother by telephone, her speech was slurred, and she was "saying things that didn't make sense." Drug testing was added to the mother's service plan.

The Department received allegations that the mother was drinking and doing drugs with her boyfriend's twin brother in May 2017. She took a drug test that same month and her test results were positive for methamphetamine. She did not dispute the test result. The Department placed the mother into an inpatient substance abuse program in which she was allowed to keep custody of J.T.

The mother remained in this inpatient facility until July 2017, at which point the substance abuse program wished to remove her. The mother testified that the program ultimately transferred her to another facility—one that did not allow children—based on three concerns: she had left the facility for 24 hours on one occasion, J.T. was acting out sexually with other children, and the program thought

4

that she might be sexually abusing J.T.

As to the 24-hour absence, the mother testified that she had to fill a prescription at a hospital and that it took her a full day to do so. The caseworker testified that the program thought the mother was dishonest. According to the caseworker, the mother eventually admitted that she had been with her former boyfriend's brother, Adrian, with whom she had a relationship. The mother's absence violated the program's rules.

During the mother's absence from the facility, J.T. reportedly performed oral sex on another boy. The mother testified that she did not believe that J.T. had done so. But this was not the sole report that J.T. had acted out sexually. The Department had been informed that J.T. had drawn pictures of genitalia, talked about sex, and exposed himself to girls who also resided on the property. The mother also acknowledged that J.T. previously had displayed "inappropriate behavior towards animals," including once inserting a finger into a cat's anus.

As to the concern that the mother might be sexually abusing the boy, the caseworker testified that the oversexualized behavior exhibited by J.T. usually indicates abuse. The caseworker stated that she had counseled the mother about inappropriate sexual behavior because the mother "wanted to be naked with the child in the tub." The mother conceded that "there were concerns" but denied that she had bathed in the nude with J.T. She said she had asked if it would be okay to bathe with

5

him if she wore a bathing suit.

By this point, the caseworker testified, the Department thought that J.T. needed to be placed elsewhere for his own safety. In addition to the preceding concerns, the caseworker stated that she had doubts about the mother's mental health due to things the mother would say. J.T. was placed with a maternal great aunt and her husband in July 2017 when his mother transferred to the other inpatient facility that did not house children.

The mother successfully completed that inpatient substance abuse program in August 2017. She then refused a recommended outpatient substance abuse program that would have provided her with transitional housing. As a result, the mother was homeless for several months. Despite her homelessness, she eventually did complete the outpatient program.

In December 2017, the caseworker met with the mother to encourage her to fulfill the requirements of her family service plan. As part of this plan, the mother had a psychiatric evaluation and was diagnosed as having a mood disorder. She participated in a domestic violence program but was expelled for noncompliance; in February 2018, she began participating in another domestic violence program that she completed.

The Department received a report of domestic abuse in February 2018. The caseworker testified that the mother's face was bruised, which the mother initially

attributed to a car accident. The mother later admitted, however, that Adrian had punched her for losing something unspecified that he had told her to hold for him. The caseworker testified that neighbors said that Adrian and the mother were living together. The police arrested him for assault of a family member based on this incident.

The following month, March 2018, the caseworker saw the mother walking down the sidewalk arm-in-arm with Adrian. The mother, however, denied that it was Adrian and insisted that the man "was a look alike."

In June or July 2018, the caseworker visited the mother's apartment. An unknown, half-naked man answered and said he was housesitting.

The mother was evicted from her apartment that summer. The nature of the eviction was disputed. The Department contended that she failed to pay her rent and that many people were in and out of the apartment. The mother said that a neighbor was responsible for the traffic and that she was wrongfully evicted. For the next year or more, she lived with friends, moving from place to place. She testified that she had difficulty finding another landlord willing to rent to her due to the eviction.

In October 2018, the Department moved to terminate the mother's parental rights due to her unstable housing situation and concerns that she remained involved with Fabian or Adrian, both of whom were violent. At this point, a new caseworker was assigned to the case in place of the original one.

The mother's drug tests since May 2017 were negative. But in March 2019, she tested positive for cocaine. An expert testified that the results were consistent with a weekend binge. The mother denied using cocaine intentionally. She attributed the positive test result to her association with "unsavory individuals." She explained that methamphetamine, not cocaine, had been her drug of choice. According to her, someone must have "put it maliciously in something" she ingested.

J.T. continued to live with his great aunt and her husband through trial. He was in therapy during this period for anger issues. J.T.'s anger can be explosive, frightening, and atypical for a child. The Department concluded that J.T.'s behavioral problems resulted from being sexually abused by his father and that the mother had not done so. According to the second caseworker, J.T.'s great aunt and her husband have been able to manage his anger and provide him with "a normal childhood." J.T. is well cared for in their home, but they cannot provide for J.T. in the long term due to their advanced age.

The maternal great aunt's stepdaughter and her family would like to adopt J.T. The stepdaughter testified that her family—consisting of her, her husband, and their three children aged 20, 16, and 13—"would love to have" J.T. live with them. They consider him family. They have known J.T. for two to three years. During this period, J.T. has spent summers with them and stayed over with them for a week every other month. She stated that they are aware of J.T.'s anger issues and want to

ensure that he continues to receive the therapy he needs. The stepdaughter testified, "I don't want him to end up in a prison as an adult because nobody cared enough to intervene."

The mother testified that she has "a great relationship" with J.T. and will place his best interest first. Since he was removed from her care, she has visited him once a month and talks with him by telephone once every other day or so. The mother stated that she is not using drugs, and that she has done everything that the Department has required her to do. She testified that she has been employed at one restaurant for about two years, has a second job at another restaurant, and works about 60 hours a week. The mother stated that she had signed a lease and was scheduled to move into a new apartment the day after trial concluded.

The Department did not agree that the mother had fulfilled all requirements of her service plan. The initial caseworker testified that the mother was unsuccessfully discharged from individual therapy and thus never began family counseling with J.T. as a result. In addition, she noted that even when the mother did satisfy the requirements of her plan, she did not necessarily change her lifestyle for the better; for example, the mother continued seeing one of her abusers after completing counseling for domestic violence. The initial caseworker attended all visits between the mother and J.T. through mid-October 2018. While the caseworker did not dispute that the mother loved J.T. and wanted him to be returned to her, the

9

caseworker testified that the mother generally did not get along very well with J.T. during their visits.

The second caseworker gave similar testimony. She stated that the mother failed to satisfy her family service plan's requirement to maintain stable housing. She testified that securing a lease for an apartment beginning the day after trial did not satisfy this requirement. The mother's March 2019 cocaine use also violated her plan. Though the caseworker acknowledged that the mother had fulfilled her service plan in most other respects, she likewise testified that the mother had a pattern of compliance followed by reversion to undesirable behaviors that required the Department to repeatedly intervene. For example, the mother had a pattern of drug relapse and being involved with abusive men.

The second caseworker testified that the Department had concluded termination was in J.T.'s best interest. Supporting factors included:

- the mother kept J.T. in an environment in which he was sexually abused and exposed to domestic violence;

- the mother did not maintain a consistent lifestyle;

- the mother did not maintain stable housing;

- the mother had a pattern of drug abuse; and

- the mother failed to support the child financially, including when he was in the care of relatives.

More generally, the caseworker testified that the mother was not truthful about her

10

living arrangements and that her behavior put J.T. "in an emotional state where he can't really be a normal child."

J.T.'s guardian ad litem also recommended termination. She recommended that J.T.'s current placement with his great aunt be maintained until the great aunt's stepdaughter could adopt him. J.T.'s current placement "provided a tremendous amount of stability" and met all his needs. Removing J.T. from this stable environment would be harmful because he "is still healing from the trauma he went through" and this healing process "could take years." The ad litem concluded that the mother's "ability to make rational decisions for the child is questionable" and that her "ability to be protective" of J.T. is "doubtful."

J.T. has said that he wants to stay with his great aunt and the great aunt's stepdaughter's family. The mother did not dispute that J.T. had said so, but she testified that J.T. did not have an accurate understanding of her present circumstances and "the changes" that she had made.

The trial court terminated the father's and mother's parental rights. With respect to the mother, the court found that there was clear and convincing evidence that the she had:

- knowingly placed or knowingly allowed J.T. to remain in conditions or surroundings that endangered his physical or emotional wellbeing;

- engaged in conduct or knowingly placed J.T. with persons who engaged in conduct that endangered his physical or emotional wellbeing;

11

- not complied with provisions of her court-ordered family service plan; and

- used an illegal drug in a way that endangered J.T.'s health and safety and continued to abuse an illegal drug after the completion of a court-ordered substance abuse treatment program.

*See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P). The trial court further found by clear and convincing evidence that termination of her parental rights was in J.T.'s best interest. *See id.* § 161.001(b)(2).

The mother appeals.

## DISCUSSION

The mother contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed or knowingly allowed J.T. to remain in conditions or surroundings that endangered his physical or emotional wellbeing and that she engaged in conduct or knowingly placed J.T. with persons who engaged in conduct that endangered his physical or emotional wellbeing. The mother also contends that the evidence is legally and factually insufficient to show that termination of her parental rights is in J.T.'s best interest.

### *Legal Standard for Termination of Parental Rights*

A parent's rights to the care, custody, and management of his or her child are constitutional in scope. *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). But parental rights are not absolute; the Department may terminate the rights of those who are not fit to accept the

12

responsibilities of parenthood. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The primary focus in a termination suit is protecting the child's best interest. *Id.*

To terminate parental rights under the Family Code, the Department must establish that a parent committed one or more statutorily enumerated predicate acts or omissions and that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1), (2). The Department need only establish one of these predicate acts or omissions, along with the best-interest finding. *See id.*; *A.V.*, 113 S.W.3d at 362. But the Department must make these showings by clear and convincing evidence. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Section 161.001(b)(2)'s best-interest finding is a separate inquiry from section 161.001(b)(1)'s predicate acts and omissions. *In re S.R.L.*, 243 S.W.3d 232, 235 (Tex. App.—Houston [14th Dist.] 2007, no pet.). But evidence used to prove predicate acts or omissions may be probative in deciding a child's best interest. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Multiple non-exclusive factors bear on a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include:

- the desires of the child;

- the emotional and physical needs of the child now and in the future;

13

- the emotional and physical danger to the child now and in the future;

- the parental abilities of those seeking custody;

- the programs available to assist them to promote the child's best interest;

- their plans for the child or the plans of the agency seeking custody;

- the stability of the home or proposed placement;

- the acts or omissions of the parent that may indicate the existing parent-child relationship is not proper; and

- any excuse for the parent's acts or omissions.

*Id.*; *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). These factors are not exhaustive, no one factor is controlling, and a single factor may be adequate to support termination on a particular record. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

### *Legal and Factual Sufficiency Review in Termination Cases*

Because of the elevated burden of proof required in termination cases—clear and convincing evidence—we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In conducting a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* at 630–31; *see In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (reviewing court credits evidence that

supports finding if reasonable factfinder could have done so and disregards contrary evidence unless reasonable factfinder could not have done so). The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *A.C.*, 560 S.W.3d at 631.

In conducting a factual-sufficiency review in a termination case, we must weigh disputed evidence contrary to a finding against all the evidence in favor of the finding. *Id.* We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.* In reviewing for factual sufficiency, however, we must be careful not to usurp the role of the factfinder. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

Deciding whether and to what degree to credit the evidence introduced at trial is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility. *Id.*; *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and

evaluates witness demeanor and credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

### *Appellate Review of Endangerment Findings*

The Family Code enumerates more than twenty predicate acts or omissions that may support termination of parental rights. *See* TEX. FAM. CODE § 161.001(b)(1). Two of these concern child endangerment. *Id.* § 161.001(b)(1)(D), (E). Under section 161.001(b)(1)(D), a trial court may terminate parental rights based on a finding that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the child's physical or emotional wellbeing. *Id.* § 161.001(b)(1)(D). Under section 161.001(b)(1)(E), a trial court may terminate parental rights based on a finding that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the child's physical or emotional wellbeing. *Id.* § 161.001(b)(1)(E).

Child endangerment findings can have collateral consequences because a parent-child relationship may be terminated on the basis that the parent had his or her parental rights terminated with respect to another child for child endangerment. *See id.* § 161.001(b)(1)(M). Due to these collateral consequences, due process requires an appellate court to review challenged endangerment findings even if the evidence suffices to support findings of other predicate acts or omissions justifying

16

termination. *In re N.G.*, 577 S.W.3d 230, 234–37 (Tex. 2019) (per curiam). We also must detail our analysis as to challenged endangerment findings. *Id.* at 237.

Subsection (b)(1)(D) focuses on the child's environment, while subsection (b)(1)(E) focuses on a parent's conduct. TEX. FAM. CODE § 161.001(b)(1)(D), (E); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). But because both subsections concern endangerment, the evidence pertinent to each may overlap. *S.R.*, 452 S.W.3d at 360; *see also Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (parental conduct can create environment that endangers child). Thus, we usually consider predicate findings made under these two subsections together. *See S.R.*, 452 S.W.3d at 360.

To endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.* Endangerment may be inferred from parental misconduct even if the conduct it not directed at the child, does not occur in the child's presence, and does not actually injure the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Physical danger is not required. *S.R.*, 452 S.W.3d at 360. The possible ill effects of a family environment that is less than ideal are not enough to show endangerment. *Walker*, 312 S.W.3d at 616. But conduct that subjects a child to a life of uncertainty and instability suffices to show endangerment. *S.R.*, 452

S.W.3d at 360. Inappropriate, abusive, or illegal conduct by persons who live in the child's home can create an environment that endangers the child. *Id.*

## *Analysis*

### *Predicate Acts and Omissions*

The trial court found that four distinct predicate acts and omissions supported termination of the mother's parental rights. The mother challenges the trial court's endangerment findings. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). But she does not challenge the other two findings—that she did not comply with provisions of her court-ordered service plan and that she used an illegal drug in a way that endangered J.T.'s health and safety and used drugs again after completing a court-ordered substance abuse program. *See id.* § 161.001(b)(1)(O), (P). These unchallenged findings, which are supported by the evidence, satisfy the predicate-acts-and-omissions requirement for termination. *See id.* § 161.001(b)(1); *see also In re K.R.P.*, 80 S.W.3d 669, 675 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (unchallenged findings supported by evidence are binding on appeal).

As to the endangerment findings, the mother argues that she neither anticipated nor had reason to anticipate the unfortunate events that precipitated J.T.'s most recent removal from her care, such as domestic abuse by her boyfriend. She also argues that her minimal drug use does not rise to the level of endangerment.

18

The evidence shows that about a month after J.T. was returned to his mother's care in February 2017, her boyfriend Fabian violently broke into her home and physically attacked her while J.T. hid in a bedroom. The Department required the mother to receive counseling for domestic violence, but J.T. remained in her care.

Two months later, the mother's behavior indicated that she was abusing drugs. Her speech was slurred and insensible. The Department thus required her to be drug tested. When she was tested the next month, her results were positive for methamphetamine. The mother conceded that she had used methamphetamine, which she described as her drug of choice. Afterward, the Department placed her in an inpatient substance abuse program where J.T. was allowed to remain in her care.

But J.T. was removed from her care two months later in July 2017 because the inpatient program wanted her out of its facility. The program's desire to expel the mother arose in part from her failure to comply with its rules. Specifically, she left for a 24-hour period and the program did not believe the excuse she gave for her absence. One of the caseworkers testified that the mother eventually admitted that her excuse had been false and that the mother acknowledged that she had left to spend time with her former boyfriend's twin brother, Adrian.

Another reason the program wanted to expel the mother was because J.T. was acting out sexually with other children at the facility. Though the mother knew her

son had been sexually abused by his father years before, she did not believe the program's claim that her son was acting out sexually with other children.

At the same time that J.T. was removed from his mother's care, his mother was transferred to another facility run by the inpatient substance abuse program. She successfully completed the inpatient program about a month or so afterward.

The mother was then offered but refused placement in an outpatient program that included housing. She became homeless for several months but eventually—the record is not clear when exactly—moved into an apartment complex.

The mother completed an outpatient substance abuse program. She was expelled from one domestic violence program but successfully completed another.

The mother had begun seeing Adrian romantically at some point and they reportedly were cohabitating. In February 2018, he assaulted her. She initially attributed her resulting injuries to a car accident, but later admitted the assault.

Several months later, the mother was evicted from her apartment. From that point on, she stayed with various friends, moving from place to place.

In October 2018, the Department sought termination of the mother's parental rights due to her unstable housing situation and her continued involvement with either Fabian or Adrian, both of whom had previously assaulted her.

Though the mother had tested negative for drug use for more than a year, she tested positive for cocaine in March 2019. The mother claimed that someone must have surreptitiously placed cocaine in something that she had consumed.

Based on this record, we conclude that there is legally and factually sufficient evidence of endangerment to satisfy subsections 161.001(b)(1)(D) and (E). In particular, the record shows that the mother has repeatedly abused illegal drugs, continued to associate with a violent boyfriend, and has a longstanding history of unstable housing that is not attributable to financial inability. Taken together, these circumstances are clear and convincing evidence of child endangerment.

As to the mother's drug use, she used methamphetamine before J.T. was removed from her care. Illegal narcotics use supports a finding that a child's surroundings endanger his physical and emotional wellbeing. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). After J.T.'s removal, the mother tested positive for cocaine. Repeated illegal narcotics use supports a finding that a parent has engaged in a course of conduct that endangers the child's physical and emotional wellbeing. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Though the mother denies that she intentionally ingested cocaine, the trial court, as factfinder, reasonably could have disbelieved her. *Id.* at 832; *In re S.C.F.*, 522 S.W.3d 693, 700 (Tex. App.—Houston [1st Dist.] 2017,

21

pet. denied). The trial court also could have reasonably found that the mother's dishonesty as to her drug use made relapse and future endangerment more likely.

The mother argues that there is no evidence that she used methamphetamine in J.T.'s presence or that he was actually harmed by her drug abuse. In the absence of contrary evidence, however, the trial court reasonably could have inferred that any drug use occurred while J.T. was in her care based on her status as the child's primary caregiver. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 100 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Moreover, it is well settled that drug use need not occur in front of a child to constitute endangerment. *N.J.H.*, 575 S.W.3d at 831. Illegal narcotics use endangers children by rendering the parent too impaired to care for them and is accompanied by the possibility of prolonged and unplanned separation due to incarceration. *Id.* at 831–32.

Though the mother is correct that the record shows limited instances of drug abuse, these limited instances are sufficient to show endangerment. We note in particular that the mother's cocaine use occurred after the Department sought termination of her parental rights. A parent's use of illegal narcotics during the pendency of a termination suit supports a finding that the parent engaged in conduct endangering the child's physical and emotional wellbeing. *Id.* at 832. We further note that the mother's cocaine use occurred after lengthy treatment for substance abuse, which the trial court reasonably could have found called into question her

22

willingness or ability to improve and cease endangering her child. *See In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

With respect to domestic violence, we agree that there is no proof that the mother had reason to anticipate any violence before it occurred. But there is evidence that she continued to see at least one of her abusers after he had assaulted her and after she had been repeatedly counseled for domestic violence. A parent's continued association with a known abuser is a conscious choice that endangers a child's physical and emotional wellbeing because it exposes the child to the possibility of violence. *See S.C.F.*, 522 S.W.3d at 700; *Jordan*, 325 S.W.3d at 721–22.

The mother denied the continued association, testifying that the caseworker was mistaken that she continued seeing Adrian romantically after he assaulted her. Once again, however, the trial court, as factfinder, was free to credit the caseworker's testimony over the mother's version of events. *See J.O.A.*, 283 S.W.3d at 346.

The evidence also showed that the mother had not had stable housing for a year or more before trial. The mother disputed the cause of this instability, claiming that she had been wrongfully evicted, but she did not attribute her situation to financial inability. In addition, before her eviction, she chose to be homeless rather than enter an outpatient substance abuse program that provided transitional housing. The trial court reasonably could find that the mother's conduct endangered J.T. because behavior that subjects a child to a life of uncertainty and instability is

23

sufficient to show endangerment. *See S.R.*, 452 S.W.3d at 360; *see also In re K.P.*, 498 S.W.3d 157, 172 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (long-term lack of residence and stable living arrangements supported endangerment finding); *Wyatt v. Dep't of Family & Protective Servs.*, 193 S.W.3d 61, 71 (Tex. App.— Houston [1st Dist.] 2006, no pet.) (evidence of long-term unstable housing situation not outweighed by evidence that parent moved into apartment days before trial).

Viewing all the evidence in the light most favorable to the trial court's endangerment findings and considering undisputed contrary evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that these findings are true. In light of the entire record, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of these endangerment findings is not so significant that the factfinder could not have formed a firm belief or conviction that they are true. We thus hold that the evidence is legally and factually sufficient to support these findings. *See A.C.*, 560 S.W.3d at 630–31.

We overrule the mother's first issue.

### Best Interest of the Child

The mother likewise argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in J.T.'s best interest. An evaluation of the *Holley* factors refutes her argument.

The mother concedes that J.T. has expressed a desire to live with his maternal great aunt or her stepdaughter rather than return to his mother's care. She argues that J.T.'s preference is uninformed, but she concedes that there is little evidence as to what J.T. knows about his mother's present situation. J.T. did not testify.

As to J.T.'s emotional and physical needs now and in the future, the record contains undisputed evidence that he was sexually abused by his father at a very young age and consequently has significant anger issues requiring therapy. The second caseworker testified that his great aunt and her husband have been able to manage J.T.'s anger and give him a normal childhood. The great aunt's stepdaughter testified that she and her family are committed to ensuring J.T. receives the therapy and support that he needs. In contrast, the mother discounted a report that J.T. had sexually acted out with other children despite her knowledge of the prior sexual abuse. From this evidence, the trial court reasonably could have found that J.T.'s mother did not understand J.T.'s needs and was unprepared to meet them, which supports its best-interest finding. *See Wyatt*, 193 S.W.3d at 69.

The evidence of the mother's repeated drug use, continued association with a violent boyfriend, and history of unstable housing not attributable to financial inability bears on the emotional and physical danger to J.T. now and in the future. Because we have reviewed this evidence at length in connection with the trial court's endangerment findings, we will not repeat ourselves here. *See A.A.A.*, 265 S.W.3d

at 516 (evidence of predicate acts and omissions may be probative of child's best interest). We note, however, that evidence of endangerment is especially probative of J.T.'s best interest. *See Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 198 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *see also Walker*, 312 S.W.3d at 619 (evidence of endangerment relevant to endangerment finding also probative in assessing child's best interest).

As to the mother's parenting abilities, there is some evidence in the mother's favor. When the Department investigated allegations of neglectful supervision in February 2017, its investigation did not substantiate them. J.T. looked healthy. But there also is unfavorable evidence. While the mother was in an inpatient substance abuse program, she abandoned her son for 24 hours to spend time with a boyfriend. A caseworker also testified that the mother had to be told not to bathe in the nude with J.T. during this timeframe. Though the mother denied doing so, the trial court, as factfinder, reasonably could have believed the caseworker instead of the mother.

Regarding programs available to promote J.T.'s best interest, there was little or no direct evidence as to what programs could assist the mother in the future. But the mother did not satisfy all requirements of her family service plan. In addition, she used cocaine after completing both inpatient and outpatient substance abuse programs. There also was evidence that she continued to associate with a known abuser despite completing domestic abuse counseling. The trial court, as factfinder,

reasonably could have found that the mother was unlikely to benefit from any services available to promote J.T.'s best interest based on her failure to complete all the requirements of her family service plan and her additional failure to change her behavior after completing other programs. *See N.J.H.*, 575 S.W.3d at 835 (noncompliance with court-ordered service plans bears on whether parent will benefit from programs available to assist in promoting child's best interest); *Wyatt*, 193 S.W.3d at 70 (noting that parent didn't benefit much from classes and programs in assessing whether she'd benefit from ones promoting child's welfare).

The record contains evidence that J.T. was well cared for by his great aunt and that her stepdaughter wanted to adopt him. The stepdaughter and her family have known J.T. for two or three years and have spent substantial time with him. They consider J.T. family. J.T.'s guardian ad litem testified that his current placement gave him stability and that returning J.T. to his mother's care would jeopardize this stability. The trial court reasonably could have credited the evidence that J.T.'s current and planned placement were safe, stable, and loving—in contrast to his life in his mother's care—in considering his best interest. *See N.J.H.*, 575 S.W.3d at 835; *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

The mother provided various explanations for her acts and omissions, which the trial court, as factfinder, reasonably could have rejected. Of these explanations, one is especially notable as to J.T.'s best interest. Regarding her March 2019 drug

test result showing that she had ingested cocaine, the mother testified that she had been associating with "unsavory individuals" and asserted that one of them must have dosed her without her knowledge. Even if the trial court credited her explanation, which it was not obliged to do, her explanation is an admission that she was spending time with people who possessed illegal narcotics. The trial court could have reasonably found that the mother's voluntary association with persons who were engaged in criminal activity like narcotics possession was not in J.T.'s best interest, particularly given the mother's own history of drug abuse. *See In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (involvement with person known to engage in criminal activity endangers child's wellbeing).

Viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering undisputed contrary evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that this finding is true. In light of the entire record, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of this best-interest finding is not so significant that the factfinder could not have formed a firm belief or conviction that it is true. We thus hold that the evidence is legally and factually sufficient to support this finding. *See A.C.*, 560 S.W.3d at 630–31.

We overrule the mother's second issue.

## CONCLUSION

We affirm the trial court's judgment.

> Gordon Goodman
> Justice

Panel consists of Chief Justice Radack and Justices Kelly and Goodman.